UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OSMIN MELGAR, | Case No. 13-cv-03769-EMC |
| Plaintiff, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** |
| CSK AUTO, INC., | |
| Defendant. | Docket Nos. 58, 90 |

Plaintiff Osmin Melgar has filed a class action against Defendant CSK Auto, Inc. ("CSK"), now known as O'Reilly Auto Enterprises, LLC ("OR"). *See* Beck Decl. ¶ 4 (noting that OR acquired CSK in or about July 2008). Currently pending before the Court is Mr. Melgar's motion for class certification, in which he asks the Court to certify a class with respect to two of the claims asserted in his first amended complaint ("FAC") – *i.e.*, a claim for failure to reimburse business expenses pursuant to California Labor Code § 2802 and a claim for unfair business practices pursuant to California Business & Professions Code § 17200. The § 17200 claim is predicated on the failure to reimburse business expenses; thus, for all practical purposes (at least for the currently pending motion), the Court has before it a § 2802 claim and shall proceed accordingly.

Mr. Melgar asks for certification of the following class:

> All current and former employees for Defendant who worked at
> least one shift as a Store Manager, Assistant [Store] Manager and/or
> Retail Service Specialist[1] in the State of California at any time

---

[1] A retail service specialist or "RSS" is "kind of a level of assistant manager that fills in typically nights, weekends[;] they're typically designed to work opposite of the store manager." 30(b)(6) Depo. at 14.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   from June 26, 2009 through the conclusion of this action (the "Class
    Period").

2

3   Mot. at 1; *see also* FAC ¶ 12.  Hereinafter, Store Managers are referred to as "SMs," Assistant

4   Store Managers as "ASMs," and Retail Service Specialists as "RSSs."  Having considered the

5   parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court

6   hereby **GRANTS** in part and **DENIES** in part Mr. Melgar's motion.  The Court shall certify a

7   class but shall narrow its definition.[2]

8                  **I.    FACTUAL & PROCEDURAL BACKGROUND**[3]

9   A.    Mr. Melgar

10          OR acquired CSK in or around July 2008.  *See* Beck Decl. ¶ 4.  From June 2000 through

11  May 2013, Mr. Melgar worked for CSK and then OR, after it acquired CSK.  *See* Melgar Decl. ¶

12  2.  In 2003, Mr. Melgar became an ASM.  He continued in that position until he was no longer

13  employed by OR in May 2013.  *See* Melgar Decl. ¶ 2.  For brief periods during his employment,

14  Mr. Melgar was an acting SM.  *See* Melgar Decl. ¶ 2.

15          According to Mr. Melgar, he "regularly used [his] personal vehicle to make trips to the

16  bank on behalf of CSK [or OR]" – more specifically, to make bank deposits – "but CSK [or OR]

17  did not reimburse [him] for these expenses, even after [his] numerous complaints about not being

18  reimbursed."  Melgar Decl. ¶ 6; *see also* Melgar Depo. at 20 (stating that he complained to various

19  people).

20  B.    Bank Deposits

21          As noted above, in or around July 2008, OR acquired CSK.  Starting in 2009, before the

22  proposed class period, all CSK employees were subject to OR's policies and procedures.  *See*

23  Beck Decl. ¶ 4.

24  _____

25  [2] The Court grants OR's motion for leave to file a sur-reply.

26  [3] Each party has challenged evidence submitted by the other.  More specifically, OR has objected

27  to the survey responses submitted by Mr. Melgar, and Mr. Melgar has objected to the employee
    declarations submitted by OR.  The Court finds that the objections are not a reason to exclude the
    evidence.  At best, they affect the weight that the Court gives to the evidence.  As discussed

28  below, however, the critical evidence is not the survey responses nor the employee declarations
    but rather the testimony of OR's 30(b)(6) witness.

**United States District Court**
For the Northern District of California

### 1. Bank Deposit Requirement

OR had a policy that required each store to make a daily bank deposit (except for Sundays and holidays when the bank was not open).  *See* 30(b)(6) Depo. at 13, 16-17.  Under the policy, the bank deposit (which covered the previous day) had to be made by 2:00 p.m.  *See* 30(b)(6) Depo. at 53; Beck Decl. ¶ 11 (stating that, pursuant to Cash Handling Procedures policy from Store Operations Manual, "the bank deposit should be prepared by the closing manager, and the following day the morning manager should double-count the deposit and make sure it gets to the bank before 2pm").  The bank deposit had to be made by a member of management, which, at a store, would be a SM, ASM, or RSS.  *See* 30(b)(6) Depo. at 13-14.  There is no dispute that OR knew and expected employees to make daily bank deposits.  *See, e.g.*, 30(b)(6) Depo. at 68 (agreeing that "district managers [the managers above the SMs] are aware that employees are expected to make daily bank deposits").

### 2. Travel to Make the Bank Deposit

There were three basic means by which an employee could travel from an OR store to the bank to make the bank deposit.

- If the store and bank were close enough, the employee could **walk**.  *See* 30(b)(6) Depo. at 19 (noting that there was no policy prohibiting travel by foot); Melgar Depo. at 43 (admitting to walking to make a bank deposit near the end of his employment with OR).

- The employee could use a **delivery vehicle**.  *See* 30(b)(6) Depo. at 17-18.

- The employee could use his or her **personal vehicle**.  *See* 30(b)(6) Depo. at 17-18.

Furthermore, prior to 2010, there were a number of former CSK stores in California that did not require any travel for a bank deposit because the stores relied on **armored cars** instead.  *See* Melgar Depo. at 23; Blackburn Decl. ¶ 4 (explaining that, "[o]ver a period time as the stores were converted [from CSK] to 'O'Reilly' stores, armored car service was eliminated").

With respect to delivery vehicles, the record reflects that most OR stores do have a delivery vehicle (some more than one).  *See* 30(b)(6) Depo. at 19-20 (testifying that "across all of our locations [*i.e.*, nationwide], we have less than a hundred stores without a vehicle").  The purpose of a delivery vehicle is to make deliveries to OR's professional customers.  *See* 30(b)(6)

**United States District Court**
For the Northern District of California

1   Depo. at 20; *see also* 30(b)(6) Depo. at 48 (stating that, "[s]o with those delivery vehicles, the

2   assumption is made that we are making deliveries").  Moreover, "the majority of the time, . . . the

3   vehicle is used for deliveries."  30(b)(6) Depo. at 51.  "[T]he delivery vehicles generally are going

4   back and forth all the time, all day."  30(b)(6) Depo. at 52.  OR even has employees whose

5   specific position is delivery driver – *i.e.*, their main job duty is to make deliveries.  However,

6   delivery vehicles can be used "for any real company purpose," including making bank deposits.

7   30(b)(6) Depo. at 20.  The parties dispute how often a delivery vehicle is actually available to

8   make bank deposits.  *Compare* COD ¶ 10 (claiming that, "[w]hen they are available, team

9   members often use O'Reilly's delivery vehicles to conduct bank deposits (rather than using their

10  personal vehicle[s])"), *with* Reply at 5 n.3 (taking issue with OR's use of the word "often" on the

11  grounds that most of the 29 employee declarations cited by OR contradict this assertion); *see also*

12  Sieger Decl. ¶ 5 (testifying that, with regard to survey responses, 161 out of 212 persons stated

13  that they were not allowed to use delivery vehicles for bank deposits).

14  C.    <u>Reimbursement for Use of Personal Vehicles to Make a Bank Deposit</u>

15       OR had a mileage reimbursement policy that was standard for all its stores, including its

16  California stores.  *See* 30(b)(6) Depo. at 12.  That policy is embodied in several written

17  documents:

18  •    **Team Member Handbook.**  The Handbook states, *inter alia*, as follows: "There are

19       occasions when a team member may be asked to drive his/her personal vehicle for

20       company business.  Team members are entitled to mileage reimbursement for such use,

21       which is intended to cover operating costs (i.e., insurance, 'wear and tear,' fuel, etc.).  The

22       team member should coordinate recordkeeping and reimbursement with his/her

23       supervisor/manager."  Beck Decl., Ex. E (Team Member Handbook at 23); *see also* Beck

24       Decl., Ex. E (Team Member Handbook at 27) ("When driving a personal vehicle on

25       Company business, team members will be reimbursed mileage in lieu of gas expenses.").

26       The Handbook also states: "Team members using their personal vehicles for company

27       business are entitled to mileage reimbursement or allowance (some positions may have an

28       'allowance' as part of their compensation) and are responsible for submitting a timely

4

request to their supervisor or manager." Beck Decl., Ex. E (Team Member Handbook at 32).

- **Policy Manual.** The Policy Manual states, *inter alia*: "Team members using their personal vehicles for company business are entitled to *mileage reimbursement or allowance*. (Some team members may have 'allowance' contemplated within their compensation package.)" Beck Decl., Ex. G (Policy Manual § 113) (emphasis in original).

- **Store Operations Manual.** The Store Operations Manual has a section that "deals primarily with the proper handling of mileage reimbursement for store team members who use their personal vehicles on company business." Beck Decl., Ex. F (Store Operations Manual § 1275).

New employees received a copy of the Team Member Handbook. *See* Beck Decl. ¶ 5. In addition, all employees received training on using the Policy Manual and the Store Operations Manual. *See* Beck Decl. ¶ 9. Finally, the Team Member Handbook as well as the Policy Manual and the Store Operations Manual were available to employees through "TeamNet, a company-wide intranet that can be accessed from any computer at the retail stores." Beck Decl. ¶¶ 8, 9.

If a mileage expense was less than $20, then the employee was paid through the store's petty cash (*i.e.*, paid out of the till). If the mileage expense was more than $20, then the employee had to be reimbursed at the corporate, rather than the individual store, level. *See* 30(b)(6) Depo. at 29; Beck Decl. ¶ 14; Blackburn Decl. ¶ 5. In either situation, an employee had to fill out a request for reimbursement.[4] *See* 30(b)(6) Depo. at 29.

During the deposition of OR's 30(b)(6) witness, Mr. Melgar's counsel asked the witness:

_____

[4] According to OR,

> the existence and nature of the documentation supporting the *in-store* reimbursements varies from store-to-store and from manager-to-manager. Some managers simply note 'mileage' without indicating the purpose for the trip, and some others may indicate mileage expenses but fail to identify the team member who was the recipient of the reimbursement. Others may identify the reimbursement with greater detail, including team member name and purpose of the trip.

Blackburn Decl. ¶ 7 (emphasis added).

United States District Court
For the Northern District of California

1  "Is there a policy whereby the manager could still pay out the RSS, even though he did not

2  actively seek the reimbursement?"  30(b)(6) Depo. at 71.  In response, the 30(b)(6) witness

3  testified: "Well, I believe our policy is, is that *it's the team member's responsibility for reporting*

4  *any expenses that are incurred*."  30(b)(6) Depo. at 36 (emphasis added).  Similarly, he testified:

5  "I think it specifically calls out that *it is the team member's responsibility when they incur an*

6  *expense to go through the expense process and basically report the expense*."  30(b)(6) Depo. at

7  71 (emphasis added).  Finally, the 30(b)(6) witness testified that "I'm not aware of any training

8  that would – would encourage a store manager to, in effect, every day ask a team member, Hey,

9  did you have any personal expense today?"  30(b)(6) Depo. at 69.  Thus, the testimony of the

10  30(b)(6) witness reflects that OR did not make any reimbursement for a business expense until an

11  employee first made a request for such.  Nor did it have a practice or policy of taking affirmative

12  steps to ensure employees were reimbursed if they did not request it.

13  D.  <u>Identification of Who Delivered the Bank Deposit</u>

14      According to OR, it does not have any records in its possession, custody, or control that

15  reflects which specific employee made any given bank deposit at the bank.  *See* Blackburn Decl. ¶

16  10; *see also* 30(b)(6) Depo. at 67 (noting that there is no record of who actually delivers the

17  deposit, even for loss prevention purposes).  For example, "[t]here is no requirement that the team

18  member who takes the deposit to the bank sign the receipt provided by the bank or any other

19  receipt . . . ."  Blackburn Decl. ¶ 10; *see also* Beck Decl. ¶ 3 ("O'Reilly requires that a validated

20  deposit receipt be obtained from the bank for each deposit, but does not require that the team

21  member who took the deposit to the bank sign or otherwise annotate the verified deposit receipt

22  [issued by the bank].").

23      OR explains that, under company policy, "the team member who *prepares* the bank

24  deposit on any given day is asked to initial the Deposit Ticket . . . ."  Blackburn Decl. ¶ 10

25  (emphasis added); *see also* Blackburn Decl., Ex. K (samples of bank deposit records).  But, as OR

26  underscores, the person who prepared and initialed the Deposit Ticket is not necessarily the same

27  person who *actually took* the bank deposit from the OR store to the bank.  *See* COD ¶ 7 ("The

28  manager who *prepared* the deposit is often not the same person who *delivers* the deposit to the

**United States District Court**
For the Northern District of California

1    bank.") (emphasis added).

2        In his reply brief, Mr. Melgar failed to address this distinction that OR draws between

3    preparing a deposit and delivering it.  Furthermore, at the hearing, Mr. Melgar did not contest this

4    distinction.  Finally, Mr. Melgar did not submit any documentary evidence indicating that an

5    employee who delivered a bank deposit (as opposed to just preparing it for delivery) had to sign a

6    deposit slip or any other kind of document.  Given these circumstances, the Court agrees with OR

7    that there is no substantial evidence establishing there are documents which consistently show

8    who actually made a bank deposit (as opposed to preparing it for delivery).  *See* Opp'n at 2

9    (arguing that Mr. Melgar is using loose language and is actually (and improperly) "tr[ying] to

10   combine [two] separate and discrete activities" – *i.e.*, who prepared the deposit ticket and who

11   actually delivered the deposit to the bank).

## II.    DISCUSSION

12

13   A.    Legal Standard

14        In the instant case, Mr. Melgar asks the Court to certify a class pursuant to Federal Rule of

15   Civil Procedure 23(b)(3).  For a Rule 23(b)(3) class, a plaintiff must first meet all the requirements

16   of Rule 23(a), which are as follows:

17
         (1)    the class is so numerous that joinder of all members is
18              impracticable;

19       (2)    there are questions of law or fact common to the class;

20       (3)    the claims or defenses of the representative parties are
                typical of the claims or defenses of the class; and
21
         (4)    the representative parties will fairly and adequately protect
22              the interests of the class.

23   Fed. R. Civ. P. 23(a).

24        In addition, the plaintiff must meet the requirements of Rule 23(b)(3) – *i.e.*, "that the

25   questions of law or fact common to class members predominate over any questions affecting only

26   individual members, and that a class action is superior to other available methods for fairly and

27   efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

28

The matters pertinent to these findings include:

(A)    the class members' interests in individually controlling the prosecution or defense of separate actions;

(B)    the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C)    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)    the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

The Rule 23(a) and Rule 23(b)(3) requirements, as applicable in the instant case, are addressed below.  Before addressing those requirements, however, the Court first discusses the legal parameters of a § 2802 claim and then assesses the propriety of Mr. Melgar's proposed class definition.

B.    Legal Parameters of a § 2802 Claim

Section 2802(a) provides as follows: "An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer, even though unlawful, unless the employee, at the time of obeying the directions, believed them to be unlawful."  Cal. Lab. Code § 2802(a).  While this statute is straightforward on its face – *i.e.*, "[a]n employer *shall* indemnify," Cal. Lab. Code § 2802(a) (emphasis added) – this Court held, in *Stuart v. RadioShack Corp.*, 641 F. Supp. 2d 901 (N.D. Cal. 2009), that,

> before an employer's duty to reimburse is triggered, it must either know or have reason to know that the employee has incurred an expense.  Once the employer has such knowledge, then it has the duty to exercise due diligence and take any and all reasonable steps to ensure that the employee is paid the expense.

*Id.* at 904.  The Court explained that "[f]ocusing on the employer's knowledge parallels the approach taken by both federal and state courts when considering the similar question whether an employer may be held liable for a failure to pay overtime."  *Id.* at 903.

Notably, the Court rejected RadioShack's contention that an employer could not be held

**United States District Court**
For the Northern District of California

liable for violating § 2802 unless the employee had first made a request for reimbursement.  It

noted that, "[w]hile the employee, rather than the employer, is in the best position to know when

he or she incurred an expense and the details of that expense, such a narrow construction is at war

with § 2802's 'strong public policy . . . favor[ing] the indemnification (and defense) of employees

by their employers for claims and liabilities resulting from the employees' acts within the course

and scope of their employment.'"  *Id.* (quoting *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937,

952 (2008)); *see also Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 567 (2007)

(indicating that, when presented with an ambiguity, a court should "consider the consequences of

each possible construction and will reasonably infer that the enacting body intended an

interpretation producing practical and workable results rather than one producing mischief or

absurdity").

The Court ultimately denied the *Stuart* plaintiff's motion for summary judgment because,

even though

> the evidence submitted indicates that RadioShack expected as a
> general matter that employees would use their personal vehicles to
> conduct ICST [intercompany store transfers], and thus an entry into
> the database indicating an employee conducted an ICST may
> provide a reason to know (if not actual knowledge) that a
> reimbursable expense was incurred[,] . . . based on the record before
> the Court, the Court cannot conclude as a matter of law that
> RadioShack had such knowledge or reason to know because there is
> no evidence as to who within RadioShack logged the information
> (thus making him or her knowledgeable), or who within RadioShack
> received or otherwise obtained that information (thus making him or
> her knowledgeable), and whether any of those persons' knowledge
> is imputable to the company.

*Id.* at 904-05.

That being said, the Court also denied RadioShack's motion for summary judgment

because mere "[p]romulgation of [written] policies" – including making those policies available

online – was not sufficient to satisfy an employer's § 2802 obligation "if it knew or had reason to

know an expense was incurred."  *Id.* at 905.

In a follow-up order in *Stuart*, the Court rejected RadioShack's attempt to assert equitable

estoppel and laches as equitable defenses to a § 2802 claim.  *See Stuart v. RadioShack Corp.*, 259

9

United States District Court
For the Northern District of California

1    F.R.D. 200 (N.D. Cal. 2009).  The Court noted that a waiver defense was not applicable to a §

2    2802 claim pursuant to California Labor Code § 2804.  *See* Cal. Lab. Code § 2804 (providing that

3    "[a]ny contract or agreement, express or implied, made by any employee to waive the benefits of

4    this article or any part thereof, is null and void, and this article shall not deprive any employee or

5    his personal representative of any right or remedy to which he is entitled under the laws of this

6    State").  Thus, "it would make little sense to conclude that a waiver defense is impermissible but

7    allow a defense or equitable estoppel or laches, particularly where, as here, the three defenses are

8    all based on the same facts (*i.e.*, an employee's knowing failure to make a request for

9    reimbursement)."  *Stuart*, 259 F.R.D. at 203.  The Court also noted: "California courts have stated

10   that estoppel and laches are not available defenses where they would nullify an important policy

11   adopted for the benefit of the public."  *Id.* (citing *Feduniak v. Cal. Coastal Comm'n*, 148 Cal.

12   App. 4th 1346, 1381 (2007), and *Colby v. Title Ins. & Trust Co.*, 160 Cal. 632, 644 (1911)).

13   C.    Class Definition

14         As noted above, Mr. Melgar asks for certification of the following class:

15
16               All current and former employees for Defendant who worked at
                 least one shift as a Store Manager, Assistant [Store] Manager and/or
17               Retail Service Specialist[5] in the State of California at any time
                 from June 26, 2009 through the conclusion of this action (the "Class
18               Period").

19   Mot. at 1; *see also* FAC ¶ 12.

20         The Court agrees with OR that this proposed class definition is overbroad.  The class

21   definition is not reasonably tied to the alleged wrongful conduct.  Although it is true that "a class

22   will often include persons who have not been injured by the defendant's conduct . . . does not

23   preclude class certification," "a class should not be certified if it is apparent that it contains a great

24   many persons who have suffered no injury at the hands of the defendant."  *Kohen v. Pac. Inv.*

25   *Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009).  In the case at bar, OR had a clear policy

26
27   [5] A retail service specialist or "RSS" is "kind of a level of assistant manager that fills in typically
     nights, weekends[;] they're typically designed to work opposite of the store manager."  30(b)(6)
28   Depo. at 14.

United States District Court
For the Northern District of California

communicated to employees that they are entitled to reimbursement use of personal vehicles for company business, and even Mr. Melgar's own evidence indicates that a fair number of employees did make such requests.  *See generally* Meade Decl., Ex (survey responses).[6]

Moreover, Mr. Melgar's proposed class definition is problematic in that it puts an end date for the class period as "through the conclusion of this action."  Mr. Melgar does not explain how this end date is workable, and courts in this District have generally rejected open-ended class periods, at least where notice and opt-out under Rule 23(b)(3) applies.  *See, e.g.*, *Cruz v. Dollar Tree Stores, Inc.*, No. 07-2050-SC, 2009 U.S. Dist. LEXIS 62817, at *3-4 (N.D. Cal. July 2, 2009) (rejecting plaintiffs' "position that, since the class definition does not include an end date, the Notice Administrator should continue to notify new class members on a quarterly basis, and the class period should be left open through trial"; explaining that it was "not practicable to send newly hired store managers ongoing notices on a periodic basis"); In re Wal-Mart Stores, Inc., No. 06-02069 SBA, 2008 U.S. Dist. LEXIS 109446, at *15 (N.D. Cal. May 2, 2008) (taking note of a

---

[6] As noted above, *see* note 3, *supra*, OR has objected to the survey, but OR's objection is not well taken.

First, the survey evidence submitted by Mr. Melgar is not critical in the instant case.  The most important evidence submitted by Mr. Melgar is the testimony of OR's 30(b)(6) witness.  His testimony establishes that OR had a common policy – *i.e.*, that an employee would be reimbursed for use of a personal vehicle but only if the employee first made a request for reimbursement.  *See* Part II.E, *infra*.  In this regard, the instant case is distinguishable from *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), where there was no common policy at all, such that the plaintiffs in the case had to establish a practice applicable at all stores, and the survey evidence was pivotal to that claim.

Moreover, to the extent Mr. Melgar does rely on the survey responses as "practice" evidence, the Supreme Court did not, in *Dukes*, foreclose the use of anecdotal evidence to establish a practice.  Rather, *Dukes* simply indicates that, "for anecdotal evidence to give rise to an inference of a common practice, the evidence should be representative in number and in geography."  *Pedroza v. PetSmart, Inc.*, No. ED CV 11-298-GHK (DTBx), 2013 U.S. Dist. LEXIS 53794 at *26 (C.D. Cal. Jan. 28, 2013).  Here, the survey response rate (6%) is not as high as that in *Teamsters v. United States*, 431 U.S. 324 (1977) (12%) but it is also not as low as that in *Dukes* (0.008%).  Furthermore, even though the response rate is low, the survey responses cover 162 different OR store locations in California.  *See* Sieger Decl. ¶ 4.  As there are approximately 510 OR store locations in California, the store representation is relatively high – approximately 32% (*i.e.*, 162 out of 510).  Admittedly, there is no evidence as to how geographically spread out the 162 stores are.  But given that this case is limited to California, as opposed to covering the entire country, the geographic spread poses less of a concern.  It is also noteworthy that the survey was sent to all employees except current SMs.  *See* Goldberg Report ¶ 4.  There is no indication that the sampling was manipulated in order to produce a biased outcome.

United States District Court
For the Northern District of California

case "the court refused to certify a class where the scope of the class ran 'up to the present'[;] explaining that such a definition was 'impermissibly vague and would cause ongoing notice and case management problems'").

Accordingly, a more reasonably tailored class definition is as follows:

> All current and former employees for Defendant who worked at least one shift as a Store Manager, Assistant Store Manager and/or Retail Service Specialist in the State of California at any time from June 26, 2009 through the date of class certification (the "Class Period"), who certify that they used a personal vehicle(s) to make a bank deposit on behalf of Defendant and were not reimbursed for incurring that business expense.[7]

Contrary to what Mr. Melgar suggested at the hearing, the above definition does not constitute a fail-safe class. "'Fail-safe classes are defined by the merits of their legal claims, and are therefore unascertainable prior to a finding of liability in the plaintiffs' favor.'" *In re Conagra Foods, Inc.*, 302 F.R.D. 537, 567 n.102 (C.D. Cal. 2014); *see also Willis v. Enter. Drilling Fluids*, No. 1:15-cv-00688-JLT, 2015 U.S. Dist. LEXIS 146338, at *18-19 (E.D. Cal. Oct. 28, 2015) (stating that "[a] fail-safe class is 'when the class itself is defined in a way that precludes membership unless the liability of the defendant is established'"). That is not the case here. Indeed, the mere fact that a class member incurred a business expense and was not reimbursed does not automatically establish liability. As discussed above, an employer's duty to reimburse is triggered only if it knows or has reason to know that an expense was incurred.

Moreover, contrary to what OR suggested at the hearing, the definition does not run into an ascertainability problem. "[A] class is ascertainable if the class is defined with 'objective criteria' and if it is 'administratively feasible to determine whether a particular individual is a member of the class.'" *Huynh v. Harasz*, No. 14-CV-02367-LHK, 2015 U.S. Dist. LEXIS 154078, at *38 (N.D. Cal. Nov. 12, 2015). Here, there is objective criteria (*e.g.*, was a personal vehicle used and was the employee reimbursed?). Furthermore, there is administrative feasibility even though OR does not have records documenting who made the bank deposits and how because "courts in this

---

[7] As discussed below, during the hearing on the motion for certification, Mr. Melgar suggested that a certification process be used (akin to a claim form process) in order to address any predominance concerns. *See* Part E.2, *infra*.

circuit has found proposed classes ascertainable even when the only way to determine class membership is with self-identification through affidavits." *Krueger v. Wyeth, Inc.*, No. 03cv2496 JAH (MDD), 2015 U.S. Dist. LEXIS 137548, at *16 (S.D. Cal. Oct. 7, 2015).

To the extent OR criticizes uses of self-identification as an unreliable process, the Court rejects that argument. The need to rely on self-identification is a problem of OR's own making. OR could have kept records indicating whether an employee used a personal vehicle to make a bank deposit and whether the employee was reimbursed for that business expense. *Cf. Bruton v. Gerber Prods. Co.*, No. 12-CV-02412-LHK, 2014 U.S. Dist. LEXIS 86581, at *17 (N.D. Cal. June 23, 2014) (rejecting as unpersuasive "Defendant's argument that class certification should be denied based on Defendant's failure to keep records of which consumers purchased its products"; adding that, "if Plaintiff can prove an administratively feasible method of proving which members are part of the putative class, this Court will not deny certification based solely on Defendant's own lack of consumer data"). OR's failure should not be held against its employees so as to preclude class certification.

OR protests still that it should not be faulted for failing to maintain records on business expenses because it did not have a statutory duty to maintain such records. *See Hernandez v. Mendoza*, 199 Cal. App. 3d 721, 727 (1988) (taking note that, in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1945), the Supreme Court decided that, "where the employer has failed to keep records required by statute, the consequences for such failure should fall on the employer, not the employee"); *see also* Opp'n at 19 (arguing that, for *wage* claims, "the employer [has] a *statutory duty* to keep 'accurate information with respect to each employee including . . . time records showing when the employee begins and ends each work period'") (emphasis in original). But even if there is no statute that explicitly requires recordkeeping for business expenses, § 2802 requires reimbursement of all expenses, and, as interpreted by this Court, imposes an affirmative duty on employers to reimburse such expenses when it has knowledge thereof. Obviously, some recordkeeping is required to fulfill that duty.

Finally, OR suggests that there is still an ascertainability problem with the above definition because, to determine whether an employee is a member of the class as defined, there will need to

13

United States District Court

For the Northern District of California

1    be individualized fact findings.  The Court concludes that this argument is more appropriately

2    analyzed in the context of Rule 23(b)(3)'s predominance requirement, rather than under the rubric

3    of ascertainability.  *See infra*; *cf. In re NJOY Consumer Class Action Litig.*, No. CV 14-00428

4    MMM (JEMx), 2015 U.S. Dist. LEXIS 109133, at *87-88 (C.D. Cal. Aug. 14, 2015)

5    (acknowledging that "all of the proposed class members must have seen an advertisement to

6    recover" but stating that this was more of a predominance issue rather than an ascertainability

7    issue).  The Court recognizes, however, that one court has analyzed individualized inquiries as a

8    part of ascertainability.  More specifically, in *Backhaut v. Apple Inc.*, No. 14-CV-02285-LHK,

9    2015 U.S. Dist. LEXIS 107519 (N.D. Cal. Aug. 13, 2015), the court noted that it, "among others

10   in this District, has previously concluded that self-identification may be an acceptable way to

11   ascertain class membership"; but it rejected self-identification because there would be

12   "individualized factual proceedings" to determine whether an individual falls within the proposed

13   class that would be "administratively infeasible."  *Id.* at *31-32.  As discussed below, such

14   identification is not infeasible in the instant case.

D.    Numerosity

16         Having redefined the proposed class, the Court now turns to the Rule 23(a) and (b)

17   requirements.  As to numerosity, OR does not dispute that Mr. Melgar has satisfied this Rule 23(a)

18   requirement.  Moreover, the Court takes note of OR's concession that it "operated a total of 510

19   California retail stores throughout the state, where it employed over 4,000 putative class

20   members."  Opp'n at 3.  Given these numbers, as well as the survey responses submitted by Mr.

21   Melgar, *see, e.g.*, Sieger Decl. ¶ 5 (testifying that, with regard to survey responses, 161 out of 212

22   persons stated that they were not allowed to use delivery vehicles for bank deposits), it is a fair

23   inference that a fair number of the 4,000 employees used their personal vehicles to make a bank

24   deposit but were not reimbursed.

E.    Commonality and Predominance

26         Because Rule 23(a)'s commonality requirement and Rule 23(b)(3)'s predominance

27   requirement overlap somewhat, and the parties' arguments on the two requirements

28   correspondingly overlap, the Court addresses these two requirements in the same section.

**United States District Court**
For the Northern District of California

1.   <u>Commonality</u>

OR argues that there is no commonality in the instant case because the only common policy here was a lawful one – *i.e.*, that OR would reimburse its employees for use of their personal vehicles. *See, e.g.*, Beck Decl., Ex. E (Team Member Handbook at 23) ("There are occasions when a team member may be asked to drive his/her personal vehicle for company business.  Team members are entitled to mileage reimbursement for such use, which is intended to cover operating costs (i.e., insurance, 'wear and tear,' fuel, etc.).  The team member should coordinate recordkeeping and reimbursement with his/her supervisor/manager.").

But what OR ignores is that it also had a common policy that OR would pay *only if the employee first made a request for reimbursement* – a potentially unlawful policy under the Court's *Stuart* analysis.  That this was a common policy is supported by the testimony of OR's 30(b)(6) deponent.  During the deposition of OR's 30(b)(6) deponent, Mr. Melgar's counsel asked: "Is there a policy whereby the manager could still pay out the RSS, even though he did not actively seek the reimbursement?"  30(b)(6) Depo. at 71.  In response, the 30(b)(6) deponent testified: "Well, I believe our policy is, is that *it's the team member's responsibility for reporting any expenses that are incurred*."  30(b)(6) Depo. at 36 (emphasis added).  Similarly, he testified: "I think it specifically calls out that *it is the team member's responsibility when they incur an expense to go through the expense process and basically report the expense*."  30(b)(6) Depo. at 71 (emphasis added).  Finally, he testified that "I'm not aware of any training that would – would encourage a store manager to, in effect, every day ask a team member, Hey, did you have any personal expense today?"  30(b)(6) Depo. at 69.

Moreover, this is not the only subject in the case at bar that is susceptible to common proof.  *See Dukes*, 131 S. Ct. at 2551 ("What matters to class certification . . . is not the raising of common questions – even in droves – but, rather[,] the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.") (internal quotation marks omitted; emphasis in original).  As the Court held in *Stuart*, so long as the employer knows or has reason to know that an expense is being incurred, then it has a "duty to exercise due diligence and take any and all reasonable steps to ensure that the employee is paid the expense."  *Stuart*, 641 F.

United States District Court
For the Northern District of California

Supp. 2d at 904.  Here, there is common proof (undisputed) that OR (1) expected daily bank deposits to be made and (2) knew that personal vehicles could be used to make the trips to the banks.  There is also common proof (undisputed) that (3) OR did not do anything at a company-wide level to encourage reimbursement requests other than making its policies available to employees (*e.g.*, distribution of the Handbook to new hires and online).

In its papers, OR concedes that it "does not really dispute that it is aware some members of management incur mileage expenses in conducting bank deposits"; but, it argues, it "had no reason to know that those team members were not [in fact] being reimbursed."  Opp'n at 21.  The Court is not persuaded by this argument for several reasons.  First, at this point in the proceedings, the Court is not making any merit determinations.  Rather, at this juncture, the only question is whether a class action should be permitted, which turns on whether there is common proof apt to drive resolution of this case.  *See Dukes*, 131 S. Ct. at 2551 ("What matters to class certification . . . is not the raising of common questions – even in droves – but, rather[,] the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.") (internal quotation marks omitted; emphasis in original).

Second, there appears to be common proof as to knowledge – or even lack of knowledge – that team members were not being reimbursed.  For example, there may be common proof of knowledge because, presumably, most bank deposit travel was fairly local, and thus the reimbursement for each trip, or even several trips, would likely be $20 or less.[8]  In those cases, the reimbursement would be paid out of the store's petty cash (*i.e.*, out of the till pursuant to OR policy), *see* 30(b)(6) Depo. at 29; Beck Decl. ¶ 14; Blackburn Decl. ¶ 5, and, therefore, the SM (or whichever manager was in charge of the store at the time) would be in a position to know that (1) not only had an expense been incurred but also that (2) the expense had not paid out of the till.  Even if the reimbursement were not eligible for petty cash reimbursement because the trip to the bank is long, it seems highly likely that the SM would know when an employee made such a

---

[8] The IRS's standard mileage rate for 2015 is 57.5 cents per mile for business miles driven.  *See* https://www.irs.gov/uac/Newsroom/New-Standard-Mileage-Rates-Now-Available;-Business-Rate-to-Rise-in-2015 (last visited November 30, 2015).  Thus, $20 would cover a roundtrip of approximately 35 miles.  Or $20 would cover a round trip of 2 miles for approximately 17 days.

**United States District Court**
For the Northern District of California

1   deposit trip.  In addition, there may be common proof as to *lack* of knowledge because,

2   presumably, a district manager (who, unlike a SM, does not actually work at the store) generally

3   would not know whether an employee had been paid out of the till or made a larger deposit trip.

4   The question as to whether the SM or the district manager's knowledge is imputable to OR under

5   § 2802 presents a common question.

6         Finally, even if there were no commonality on knowledge or lack of knowledge on team

7   members not being reimbursed, the fact remains that there is still commonality on (1) OR's policy

8   of not making a reimbursement absent a request for reimbursement from an employee, (2) OR's

9   expectation of daily bank deposits and knowledge that personal vehicles could be used to make the

10   trips to the bank, and (3) OR's failure to do anything to ensure reimbursement other than

11   promulgating its policy on reimbursement.  Accordingly, the Court concludes that there is

12   sufficient commonality to meet Rule 23(a)'s commonality requirement.

13         2.  <u>Predominance</u>

14         Although a closer question, the Court also finds that Rule 23(b)'s predominance

15   requirement is satisfied.  At the hearing, OR argued that, to establish liability, each class member

16   would need to show that (1) he or she had actually incurred an expense (*i.e.*, use of a personal

17   vehicle to make a bank deposit) and that (2) he or she had not been reimbursed.  According to OR,

18   both elements (1) and (2) necessitate individualized inquiries that would predominate over the

19   common questions identified above.

20         While the Court agrees with OR that some individualized inquiries are likely, it disagrees

21   as to what the individualized inquiries will entail.  For example, as to element (1) (*i.e.*, did the

22   employee use a personal vehicle?), Mr. Melgar has offered to use a process (akin to a claim form

23   process) where, in order to be deemed a part of the class (and thus eligible for relief), each class

24   member will have to affirmatively certify that he or she used a personal vehicle and was not

25   reimbursed.  This will likely limit the size of the class and, correspondingly, any individualized

26   inquiries in the damages phase of the case.

27         Furthermore, as to element (1), the inquiries may well, to a large extent, be focused at the

28   store level rather than at the employee level – *e.g.*, were delivery vehicles routinely available and

United States District Court
For the Northern District of California

1  used at a store to make bank deposits, was the store close enough to the bank so that a deposit

2  could be made by walking, etc.  Thus, the individualized inquiries will not be as extensive as OR

3  might suggest.

4        Finally, and most importantly, even though elements (1) and (2) above are related to

5  liability, they also have bearing on damages and therefore could be accommodated at the damages

6  phase of proceedings.  Notably, courts are often more forgiving with respect to individualized

7  inquiries as to damages.  *See Kurihara v. Best Buy Co.*, No. C 06-01884 MHP, 2006 U.S. Dist.

8  LEXIS 64224, at *25-26 (N.D. Cal. Aug. 30, 2007) (noting that "courts are comfortable with

9  individualized inquiries are to damages, but are decidedly less willing to certify classes where

10  individualized inquiries are necessary to determine liability").  And OR fails to point to any

11  authority precluding analysis of the above elements as a part of damages.  Should it become clear

12  that individualized inquiries here are more substantial than it currently appears, OR could seek to

13  narrow the scope of certification, or even ask for decertification.  *See* Fed. R. Civ. P. 23(c)(4)

14  (providing that, "[w]hen appropriate, an action may be maintained as a class action with respect to

15  particular issues"); *see also Stuart v. RadioShack Corp.*, No. C-07-4499 EMC, 2009 U.S. Dist.

16  LEXIS 12337, at *53-55 (N.D. Cal. Feb. 5, 2009) (noting that, "as a general matter, courts are

17  'comfortable with individualized inquiries as to damages'" compared to liability; adding that,

18  "[s]hould it ultimately prove that individualized determination must be made as to damages . . . ,

19  those determinations may be bifurcated from liability and certification amended" pursuant to Rule

20  23(c)(4)).

21        OR's remaining arguments on predominance are also unavailing.  For example, to the

22  extent OR has argued that the affirmative defenses of equitable estoppel and laches will lead to

23  individualized inquiries, the Court, as noted above, rejected those defenses in *Stuart*, especially

24  because the factual predicates were the same as those underlying the waiver defense – *i.e.*, that the

25  employee failed to make a request for reimbursement in the first instance.  Here, OR has given no

26  indication that its defenses of equitable estoppel and laches would be that different from a waiver

27  defense.  *See* Opp'n at 15-16 (arguing that employee should be estopped from seeking

28  reimbursement if he or she previously asked for and received reimbursement, thus demonstrating

knowledge of the reimbursement request process).  OR also raises the prospect of an "unclean hands defense[]" based on a "knowing violation of O'Reilly's [reimbursement] policies," Opp'n at 16, but that defense was effectively rejected by this Court in *Stuart* as well.  More specifically, in *Stuart*, the Court rejected RadioShack's argument that promulgation of its policies was sufficient "because, under California Labor Code § 2856 an employee is required to 'substantially comply with all the directions of his employer concerning the service on which he is engaged'" and because "California Labor Code § 2861 specifies that '[a]n employee shall, on demand, render to his employer just accounts of all his transactions in the course of his service, as often as is reasonable.'"  *Stuart*, 641 F. Supp. 2d at 905.  The Court explained that §§ 2856 and 2861 "are found in a different article of the California Labor Code than § 2802" and that "§ 2802 embodies a strong public policy favoring reimbursement [and] there does not appear to be any significant countervailing public policy underlying §§ 2856 or 2861."[9]  *Id.*

Accordingly, the Court concludes that, although there will be some individualized inquiries, the common questions will still predominate over the individualized ones, and therefore Rule 23(b)(3)'s predominance requirement has been satisfied.

F.     Adequacy/Typicality

While the commonality/predominance requirements are where OR has placed its focus, it has also asserted that Mr. Melgar cannot meet the adequacy/typicality requirements (of Rule 23(a)).  One of OR's arguments clearly lacks merit, but the other deserves closer consideration.

OR asserts there is a defense unique to Mr. Melgar – *i.e.*, that he (unlike other putative class members) actually asked for reimbursement but then was denied such.  This argument is without merit for at least two reasons.  First, OR has made no showing that this defense – even if unique to Mr. Melgar – would preoccupy him or consume the litigation, all to the detriment of the class.  *See Stuart*, 2009 U.S. Dist. LEXIS 12337, at *23 (evaluating whether defense allegedly applicable to the plaintiff only was "'central to the litigation [such that it would] create a

_____

[9] The Court acknowledges that, as discussed below, OR may be able to raise some kind of equitable defense with respect to SMs, based on their dual role as putative class member and agent of employer.  *See* Part II.F, *infra*.  But even this defense would not require individualized inquiries.  Either OR will be able to raise this defense based on the dual role, or it will not.

United States District Court
For the Northern District of California

significant danger that [Mr. Stuart would] become distracted'").  That prospect is especially

unlikely since Mr. Melgar is not hedging his bets on a right to payment *because* he made a request

for reimbursement.  Rather, Mr. Melgar is keeping in line with *Stuart*, which held, as noted above,

that the employer's duty to reimburse is triggered by the defendant's knowledge, not an employee

request for reimbursement.  Second, OR's defense seems to be, at bottom, a waiver defense (*i.e.*,

Mr. Melgar knew about the need to make a reimbursement request but did not always do so); but

this Court in *Stuart* explained why such a defense is not viable with respect to a § 2802 claim.  *See*

*Stuart*, 259 F.R.D. at 202.

OR's second argument, however, has more merit.  The basic contention focuses on a

conflict of interest with respect to SMs.  OR maintains:

- "It is arguably in the SM's interest to testify that they [sic] knew of, permitted and
  encouraged the violation of the mileage reimbursement policy to increase the potential
  class recovery.  However, the SMs were required to follow and enforce O'Reilly's policies
  (including those related to mileage reimbursement), and any such conduct would be
  grounds for termination and would give rise to individualized unclean hands defenses."
  Opp'n at 16.

- "[I]t would arguably be in the interests of the SMs to claim that they knew expenses were
  being incurred but not reimbursed, but such testimony would give rise to individualized
  unclean hands defenses."  Opp'n at 17.

The Court does have a concern about a potential conflict, although it does not see the

conflict in precisely the same way as OR does.  The crux is that the SMs have a dual role in the

instant case: (1) they are putative class members with an interesting in getting compensation from

OR; and (2) they are agents of OR such that Mr. Melgar will likely rely on their knowledge and

actions (or inactions) to establish liability on the part of OR.  But if the SMs are part of the

decisionmaking authority for OR (*i.e.*, a managing agent), then that fairly raises the question of

whether they should be excluded from the class.  *Cf. In re Johnson*, 760 F.3d 66, 74 (D.C. Cir.

2014) (taking note of case where the court "held the named plaintiff could not adequately

represent the class in part because he had 'accused his own supervisor, who is a potential class

member, of racial discrimination'" and that, "[i]n order to eliminate just such a conflict, the present plaintiffs amended the definition of the putative class in their motion for certification specifically to exclude Special Agents who were part of upper management and were therefore responsible for selecting candidates for promotion from the BQLs").  And even if they should not ultimately be excluded, that is a potential conflict unique to SMs such that their interests may, to a certain extent, diverge from those of ASMs and RSSs; for instance, SMs' proof that OR knew but failed to take steps to ensure reimbursement may present a unique scenario if Plaintiffs were to contend that it is the knowledge and actions of the SMs themselves that are imputable to OR.

In any event, the Court need not dwell on the potential conflict because, at the hearing, Mr. Melgar pointed out that any potential conflict could be dealt with by setting up subclasses and then offered to amend the complaint to add a class representative for a SM subclass.[10]  The Court shall take Mr. Melgar up on his offer.  There shall be an ASM/RSS subclass and a SM subclass.  Mr. Melgar will the class representative for the ASM/RSS subclass.  Mr. Melgar has leave to amend so that he may add a class representative for the SM subclass.  Mr. Melgar has thirty (30) days from the date of this order to amend in this regard.

G.      Manageability and Superiority

As noted above, Rule 23(b)(3) also imposes manageability and superiority requirements. But just as in *Stuart*, whether these requirements are met largely turns on whether the commonality/predominance requirements are met.  *See Stuart*, 2009 U.S. Dist. LEXIS 12337, at *42 (noting that "[t]here is little dispute that . . . , so long as common questions predominate, a class action will be a superior method of adjudication and that the four criteria listed in [Rule 23(b)(3)](A)-(D) would counsel in favor of certification"); *see also* Opp'n at 23 (arguing that certification is improper "[w]here predominant individualized issues make a class action difficult to manage").

### III.      CONCLUSION

For the foregoing reasons, the Rule 23(a) and (b) requirements have been met with respect

---

[10] Mr. Melgar noted that he has been an acting SM at times in the past but nevertheless made the above offer.

to the redefined class, and the Court grants in part and denies in part Mr. Melgar's motion for class certification. The Court shall certify a class but the class shall be limited in scope to those employees who were not reimbursed for their use of personal vehicles to make bank deposits. More specifically, the class shall be defined as follows:

> All current and former employees for Defendant who worked at least one shift as a Store Manager, Assistant Store Manager and/or Retail Service Specialist in the State of California at any time from June 26, 2009 through the date of class certification (the "Class Period"), who used a personal vehicle to make a bank deposit on behalf of Defendant, and who was not reimbursed for incurring that business expense.

Although the Court so defines the class, the class shall be divided into two subclasses: one for the ASMs and RSSs and the other for SMs.

Mr. Melgar shall amend his complaint to add a class representative for the SM subclass within thirty (30) days of the date of this order.

The parties shall meet and confer to discuss timing for the issuance of a class notice and the content of such. A joint proposed class notice shall be filed within sixty (60) days after the date of this order. A status conference shall be held at March 17, 2016, at 10:30 a.m. to discuss the proposed class notice.

This order disposes of Docket Nos. 58 and 90.

**IT IS SO ORDERED**.

Dated: December 22, 2015

_____
EDWARD M. CHEN
United States District Judge